[Appeal of the National Gas Company of Philadelphia.]

in the judgment of the Court estops the defendants below from having the trees cut to the true line. The fact that Farwell and Kohler went together to see the lands, and ascertain whether the contract had been performed, shows that neither of them expected to be bound by the line pointed out by Mayers.

The Court ought to have submitted to the jury first which of the two lines was the south line of the tract, and if the White line is the true south line then did Kohler, by cutting only up to the Baird line, substantially perform his contract.

*T. C. Hipple* for defendant in error.

Howard Express Company *v.* Wile, 14 P. F. Smith, 201 ; Corn Exchange Bank *v.* Bank of Republic, 1 W. N. C., 462 ; Hyatt *v.* Johnston, 7 W. N. C., 561 ; Eister *v.* Paul, 4 P. F. Smith, 196 ; Ditmars *v.* Commonwealth, 11 Wr., 337 ; Hall *v.* Dunham, 1 W. N. C., 487 ; Snodgrass *v.* Gavit, 4 Casey, 221 ; Preston *v.* Finney, 2 W. & S., 53.

PER CURIAM: We find no error in the charge of the learned Court. There was no evidence in the case fixing the southern line of the tract. There was no official survey produced showing either the lines or the adjoiners, and if there was some testimony as to the northern line of the Willing tract that proved nothing. Under these circumstances, when Kohler acted under the information given to him by Mayers, to whom he was referred by Farwell, and who directed him to the Baird line, even if that was a mistake of Mayers, it would be a very harsh measure of justice to deny Kohler compensation for the timber which he had actually cut and delivered under his contract.

Judgment affirmed.

MAY TERM, 1881, No. 106.            MAY 18TH, 1881.

# Appeal of the National Gas Company of Philadelphia.

1. A claimant who has presented his claim before an auditor to distribute a fund arising from a sheriff's sale, and, after the claim has been passed upon, has filed exceptions without having objected to the jurisdiction of the auditor, must be held in the Supreme Court to have assented to the distribution by the auditor, and is estopped from setting up that the fund to be distributed has not been paid into court.

2. One section of a contract provided that the party of the first part should re-

[Appeal of the National Gas Company of Philadelphia.]

turn and deliver to the party of the fourth part within five days after its date certain designated securities; another section of the contract provided that the parties of the fourth part should give to the party of the first part a full and exclusive license to use a certain patent process and apparatus in the city of Harrisburg, the said license having been made ready for signatures and approved by all the parties, but that such license should not remain in force for a longer period than ten days from and after the date of the agreement, unless the parties of the first part should within said last-mentioned period return and deliver to the parties of the fourth part the said securities. *Held,* that these covenants were dependent and were the considerations for each other, and the failure of performance of the latter covenant by the party of the fourth part released the party of the first part from the obligation of the former covenant.

3. *Semble,* that a license subject to a royalty of twenty cents per thousand feet, and revocable upon failure to report and make payment, is not such a full and exclusive license as is called for by the agreement.

APPEAL of the National Gas Company of Philadelphia from the decree of the Court of Common Pleas of *Dauphin County,* distributing moneys arising from the sheriff's sale of the real estate, personal estate, and corporate franchises of the Citizens' Gas and Gaseous Fuel Company of Harrisburg.

The Citizens' Gas and Gaseous Fuel Company was incorporated December 21st, 1875, for the purpose of supplying the city of Harrisburg with gas and gaseous fuel. On the 5th of May, 1877, it purchased a lot of ground in Harrisburg on which it erected a brick building, occupied by apparatus for the manufacture of gas. Subsequently eighteen judgments were entered against the company. One of these was in favor of the Second National Bank of Philadelphia, under which execution was issued, and the real estate, corporate rights, and franchises were sold by the sheriff April 24th, 1879, for $60,000. This sum, less the sheriff's costs and expenses, constituted the fund for distribution.

The money was not paid into court, but the attorneys for the judgment creditors agreed in writing that the proceeds of the sale "shall be considered as if paid into court, and that an auditor shall be appointed to make distribution of said proceeds in like manner and with same effect as if actually paid into court."

The Court below appointed an auditor to make distribution and report. Before the auditor, in addition to the judgments of record, there were a number of claims for book debts proven and allowed. The National Gas Company presented a claim before him which was based upon a "Memorandum of settlement made and entered into by the Citizens' Gas and Gaseous Fuel Company, as parties of the first part; Nathan Hilles, as party of the second part; James C. Thompson, as party of the third part; the National Gas Company, as parties of the fourth part; and T. S. C. Lowe,

as party of the fifth part." This agreement provided, *inter alia*, as follows:

" 2. The said parties of the first part are to return and deliver to said parties of the fourth part within five (5) days from and after this date, a promissory note, made by said T. S. C. Lowe, for $5000, with $11,000 in stock of the People's Gaslight and Fuel Company; also another note, made by T. S. C. Lowe, for $5000, it having been discounted by or being now in possession of the Second National Bank of Philadelphia, together with $11,000 in bonds of the National Gas Company; also $5000 in bonds of the City Gaslight Company of Trenton, N. J., and $1000 in stock of the last-named company; also the due bill of said T. S. C. Lowe for $600, and also all other notes, stocks, bonds, due bills, and obligations of every kind (including all receipts evidencing loans of said N. Hilles's or J. C. Thompson's notes), given by the parties of the fourth or fifth parts to said parties of the first, second, or third parts.

" 5. The said parties of the fourth part are to give to the said parties of the first part, at the signing hereof, a full and exclusive license to use in the city of Harrisburg the process and apparatus described in letters patent No. ——, granted to said T. S. C. Lowe, September ——, 1875, the said license having been made ready for signatures and approved by all the parties; but such license shall not remain in force for a longer period than ten (10) days from and after this date, unless the said parties of the first part shall within said last-mentioned period return and deliver to said parties of the fourth part the notes, bonds, stocks, due bills, and obligations mentioned and referred to in article two above."

By an instrument under seal of the same date reciting the patent to Lowe, the National Gas Company granted to the Citizens' Gas and Gaseous Fuel Company, "full and exclusive liberty, license, and authority to use said process and apparatus in the city of Harrisburg," upon condition that they should account for and pay over each year a royalty at the rate of twenty cents for each and every thousand feet of gas made by them. These papers are referred to in the report of the auditor respectively as Exhibits " A " and " E."

The National Gas Company gave evidence of the value of the notes and bonds designated in Exhibit " A," and of the failure of the Citizens' Gas and Gaseous Fuel Company to return them, and claimed the sum of $22,386.26.

The auditor found as follows:

" The consideration for this agreement to deliver said notes and bonds to the National Gas Company was, as testified to by Professor T. S. C. Lowe, its president, the fact that the

[Appeal of the National Gas Company of Philadelphia.]

Citizens' Gas and Gaseous Fuel Company had originally received them for the purpose of raising money for its own use and benefit. The consideration, as stated by Captain C. F. Muench, the president, and only officer of the Citizens' Gas and Gaseous Fuel Company, joining in its execution, was the promise of the National Gas Company to grant to the Citizens' Gas and Gaseous Fuel Company an exclusive license to use a patented process for generating gas, known as the 'Lowe process.'

"In support of his theory Professor Lowe testifies that he had loaned his notes for $10,000, and also $11,000 in bonds of the National Gas Company, to the Citizens' Gas and Gaseous Fuel Company, in order to enable that company to raise money to pay its debts, and that the agreement of September 21st, 1877, was made in order to compel the latter company to pay these notes and return the bonds. This testimony of Professor Lowe is, however, directly contradicted by the testimony of Nathan Hilles and J. C. Thompson, both of whom testify, in the most positive manner, that the notes were given by Professor Lowe to enable Mr. Thompson to secure a loan of money through Mr. Hilles, then the president of the Second National Bank of Philadelphia, for Lowe's own use and benefit; that the only one of these notes which was ever negotiated was discounted by the Second National Bank of Philadelphia, and the whole proceeds paid to Professor Lowe personally; that the $11,000 of National Gas Company bonds were delivered by Professor Lowe to Mr. Thompson as collateral security for the other of said notes, and that the same were pledged as collateral, with Professor Lowe's consent, for the note previously discounted; that all the transactions relative to said notes and bonds were with Professor Lowe individually, and for his own use and benefit, and that the Citizens' Gas and Gaseous Fuel Company had nothing whatever to do with the matter, and at this time Mr. Hilles had n thing whatever to do with the Citizens' Gas and Gaseous Fuel Company. Professor Lowe further testifies that the bonds were not delivered as collateral for these notes, or either of them, but were loaned at another time to the Citizens' Gas and Gaseous Fuel Company.

"In this he is further contradicted by the note of October 5th, 1876, which expressly states that T. S. C. Lowe (the drawer) has 'deposited herewith twenty-two bonds of $500 each of the National Gas Company of Philadelphia, as collateral security.' Messrs. Hilles and Thompson are entirely without interest in this distribution, so far as has been made to appear to your auditor, while Professor Lowe appears to

be an interested party. While it is true that the claim is formally made on behalf of the National Gas Company, no satisfactory evidence was produced to show how the National Gas Company became the owner of the notes which Professor Lowe claims to have loaned to the Citizens' Gas and Gaseous Fuel Company. Besides, he is the president of the National Gas Company, the stocks and bonds of which are almost entirely owned by his wife. Being contradicted, as he is, by two disinterested witnesses and by his own note, your auditor is constrained to conclude that Professor Lowe's testimony as to the consideration for the agreement of September 21st, 1877, is inaccurate, and that the Citizens' Gas and Gaseous Fuel Company, prior to that agreement, had nothing whatever to do with said notes and bonds, or any of them, and was under no obligation to any person with respect to them, or any of them.

" If this conclusion be correct the consideration for the agreement on which this claim is based, as alleged by Professor Lowe, never had any existence ; the agreement is void and does not constitute a contract, and is insufficient to sustain any claim.

" But how stands the agreement in the light of the testimony of Captain C. F. Muench? He testifies that the sole inducement for the execution of this agreement by him was the promise of the National Gas Company to give the company of which he was president, the exclusive right to use the ' Lowe process ' in the city of Harrisburg. He gives substantial reasons for his desire at that time to secure that exclusive license, viz., that the National Gas Company was then threatening to prevent any further use of this process by his company.

" Besides, in the opinion of the auditor, the proper construction of the agreement seems clearly to indicate that the consideration is to be found in the mutual covenants contained in the paper ; and these covenants are in harmony with the testimony of Captain Muench upon the question of consideration. The fifth paragraph of the agreement stipulates that the National Gas Company shall give the Citizens' Gas and Gaseous Fuel Company a full and exclusive license to use the ' Lowe process.' Did the National Gas Company comply with this stipulation?

" Professor Lowe testified that Exhibit ' E,' dated September 21st, 1877, is the license referred to in paragraph five of the agreement, and that a duplicate original thereof was delivered to Mr. Hilles, secretary of the Citizens' Gas and Gaseous Fuel Company, at the time of the execution of Exhibit ' A.'

"Captain Muench, the only person representing the Citizens' Gas and Gaseous Fuel Company in the execution of Exhibit 'A,' testifies that the license mentioned in Exhibit 'A' was never delivered to him, and was never delivered to any one else to his knowledge. Is Lowe correct in stating that he delivered it to Hilles in Harrisburg on that day? The paper bears the signature of W. M. Burke, secretary of the National Gas Company, and also the corporate seal. Professor Lowe says it was prepared ready for signatures in Philadelphia, while Exhibit 'A' was prepared in Harrisburg. Burke, the secretary, according to the testimony, was not in Harrisburg, and could not then have signed Exhibit 'E.' If not then signed by Burke it could not then have been delivered by Professor Lowe. Again, the seal of the National Gas Company is on the paper, and the office of the company was in Philadelphia. It may be that Lowe had the seal with him and affixed it in Harrisburg, as he testifies, but the mistakes heretofore pointed out in his testimony create a doubt in the mind of the auditor as to the accuracy of his recollection at this point.

"This license, even if delivered, is not, in the opinion of the auditor, such a license as meets the requirements of paragraph five of the agreement.

"That paragraph calls for 'a full and exclusive license.' This is a license subject to a royalty of twenty cents per M. feet, and being thus restricted by the reserved right of the company to demand that sum for every M. feet of gas made, is not such 'full' license as the agreement demands or as the parties contemplated when the agreement was made.

"There is no pretence that it was ever delivered to Captain Muench, the president of the company, or accepted by him as meeting the terms of his agreement. Without proof of such delivery and acceptance, has the National Gas Company shown such compliance with its portion of the agreement as will enable it to compel a performance by the Citizens' Gas and Gaseous Fuel Company? It is very doubtful whether a delivery to Hilles, as secretary, and an acceptance by him is sufficient even if admitted. But this license further stipulates that if the Citizens' Gas and Gaseous Fuel Company neglects or refuses for thirty days to make report of gas manufactured and payment thereof, according to the terms of said license, then the National Gas Company may, at its option, revoke said license absolutely.

"That the Citizens' Gas and Gaseous Fuel Company did not make reports and payments is proven, as is also the fact that the National Gas Company in consequence thereof, exercised its option to revoke said license, and then sold the ex-

clusive license, free of royalty, to Messrs. Fleming & Hildrup for a large sum of money, to wit, $12,000. This purchase was made by these gentlemen individually, and not for the Citizens' Gas and Gaseous Fuel Company, and they were not at the time interested in the company in any way. Having thus recalled the only consideration shown for the agreement under which it now claims, your auditor is of opinion that the National Gas Company cannot enforce any claim under it."

The National Gas Company filed exceptions to this finding. The Court below, PEARSON, P. J., dismissed the exceptions, and confirmed the report. The company then appealed, assigning as error that the Court below had no jurisdiction of the matter in controversy, because the fund for distribution was never actually in court, and that the Court erred in dismissing the exceptions.

*Hall & Jordan* for the appellant.

What gives the Court authority is a grasp upon the proceeds of the sale. Without this they are powerless for its distribution: Williams's Appeal, 9 Barr, 267 ; Atkins's Appeal, 8 P. F. Smith, 86.

Under the act of June 28th, 1871, all the parties in interest must assent.

Want of jurisdiction can be taken advantage of in any stage of the proceedings: Borough of Little Meadows, 4 Casey, 256; Osgood *v.* Thurston, 23 Pick., 110; Hoffer *v.* Wightman, 5 Watts, 205; Clay *v.* Irvine, 4 W. & S., 232; Commonwealth *v.* Hoffman, 24 P. F. Smith, 105.

The two papers dated September 21st, 1877, were executed at the same time, and refer to each other: Noell *v.* Graves, 8 Reporter, 308.

The law implies a consideration from the seal; they recite that they are a settlement between the parties, and they contain mutual covenants : 1 Parsons on Contracts, 373 ; Chitty on Contracts, vol. i, page 50 ; Kent's Commentaries, vol. ii, page 465* ; Kiester *v.* Miller, 1 Casey, 481 ; Kidder *v.* Boom Co., 12 Harris, 193.

At the time of and by the terms of the agreement, the company covenanted for the surrender of the securities, and this contract itself estopped the company from questioning the right of the National Gas Company to them. The auditor assumes that a license upon a royalty was not an exclusive license. The parties themselves were the proper judges of what their own agreement meant, and the clause " ready for signature and approved by all the parties," shows that this was the license intended. The covenant meant

that the purchaser was to have the right to use the process in Harrisburg to the exclusion of all others, but not that they were to pay nothing for it.

The evidence shows a delivery, and the contract was just as good without delivery as with it. There is a presumption of delivery: Kronk *v.* Insurance Co., 8 W. N., 52; Shelton's Case, Cro. Eliz., 7; Steel *v.* Tuttle, 15 S. & R., 210; Diehl *v.* Emig, 15 P. F. Smith, 320; Blight *v.* Schenck, 10 Barr, 285.

*Fleming & McCarrell* and *Gilbert & McPherson* for the appellees.

As to the question of jurisdiction, no other parties have appealed, and the appellant is not shown to be a party in interest. The act of June 28th, 1871, can only mean parties having an apparent *prima facie* interest.

The appellant revoked and forfeited whatever license had been granted to the Gas and Fuel Company, and subsequently sold it to others. The consideration for the contract therefore failed.

PER CURIAM : It does not lie in the mouth of these appellants to raise the objection that the fund was not in court for distribution. They appeared before the auditor, made no objection to his jurisdiction, presented their claim, and it was passed upon. They filed exceptions to the report without raising this objection. If they were parties in interest, under the act of June 28th, 1871, they must be held at this stage of the proceedings to have assented to the distribution by the auditor. We see no such palpable error in the findings of fact by the auditor confirmed by the opinion of the Court as would justify us in reversing the decree. It is evident, we think, that sections 2d and 5th of the agreement of September 21st, 1877, were dependent covenants,—the one the consideration of the other. The failure of the performance of section 5th, found by the auditor, released the Gas and Gaseous Fuel Company from their obligation under section 2d, and it followed that the appellant had no claim on the fund.

Decree affirmed, and appeal dismissed at the cost of the appellants.